671 So.2d 988 (1996)
Warren FORTUNE
v.
CHARBONNET-LABAT FUNERAL HOME and United States Fire Insurance Co.
No. 95-CA-1954.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1996.
*990 Pete Lewis, Michelle K. Buford, Lewis & Caplan, New Orleans, for Plaintiff/Appellee.
Lisa A. Montgomery, Keith M. Matulich, Lobman, Carnahan and Batt, Metairie, for Defendants/Appellants.
Wiley G. Lastrapes, Jr., New Orleans, for Third Party Defendant/Appellee.
Before BARRY, LOBRANO and PLOTKIN, JJ.
PLOTKIN, Judge.
Defendants, Charbonnet-Labat Funeral Home and United States Fire Insurance Co. (hereinafter Charbonnet), appeal a judgment awarding plaintiff, Warren Fortune, workers' compensation supplemental earnings benefits (SEB), attorney fees, and penalties, and awarding third-party defendant Tulane Medical Center Clinic medical expenses. We affirm.

Facts and procedural history
Fortune, who had been a 30-year employee at Charbonnet, injured his back in a work-related accident on December 6, 1989. As a result of the injury, Fortune underwent two different surgical procedures to his back. Fortune's treating physician, Dr. James Butler of Tulane Medical Center, determined that Fortune had reached maximum medical improvement on November 11, 1992, and assigned Fortune a 25 percent whole body physical impairment and loss of physical function.
After Fortune had reached maximum medical improvement, Charbonnet started procedures to reduce Fortune's workers' compensation benefits. At the time of the accident, Fortune earned $280 per week. Charbonnet paid total temporary disability (TTD) benefits of $186.68 from the time of the accident until April 23, 1993, at which time the benefits were reduced to SEB benefits of $73.34, based on the belief that Fortune could work a minimum wage job for 40 hours per week.
In reaching that conclusion, Charbonnet engaged the services of Kathleen Jarman of Crawford & Co., who performed a labor market survey and reportedly discovered nine jobs which Fortune was qualified to perform. On March 24, 1993, the results of that labor market survey were sent to Dr. Butler, who apparently approved the jobs. Jarman also mailed the results of the labor market survey to Fortune's home, and later to Fortune's attorney. Fortune's benefits were reduced on April 23, 1993, almost exactly one month after the results of the labor market survey were sent to Dr. Butler.
Fortune filed suit seeking reinstatement of TTD benefits and payment of outstanding medical expenses. Defendants filed a third party suit against Tulane Medical Center Clinic. *991 following a hearing, the hearing officer found that Fortune was entitled to SEB rather than TTD benefits. He awarded Fortune full SEB benefits from the date of reduction, April 23, 1983, until July 1, 1993, when Fortune began working for his stepmother earning between $40 and $50 per week. After July 1, 1993, the hearing officer held, Fortune was to be paid SEB benefits with a reduction of $45 per week representing the wages he actually received. Further, the hearing officer imposed $7,500 attorney fees and 12 percent penalties on Charbonnet. Finally, the hearing officer required Charbonnet to pay the third-party defendant $2,069.56 in unpaid medical expenses.
Charbonnet appeals, making three basic claims: (1) that the reduction of benefits was appropriate, (2) that the payments previously made to the third-party defendant were correct under the Louisiana Worker's Compensation Fee Schedule and that no further money is due, and (3) that its decisions and actions were not arbitrary and capricious.
1. Reduction of benefits[1]
Determination of the amount of SEB payments due an injured employee is governed by the provisions of LSA-R.S. 23:1221(3), which provides, in pertinent part, as follows:
(a) For injury resulting in the employee's inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three tenths times the wages as defined in R.S. 23:1021(10).
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region.
(ii) For purposes of Subsubparagraph (i) of this Subparagraph, if the employee establishes by clear and convincing evidence, unaided by any presumption of disability, that solely as a consequence of substantial pain, the employee cannot perform employment offered, tendered, or otherwise proven to be available to him, the employee shall be deemed incapable of performing such employment.
Generally, the purpose of SEB is "to compensate the injured employee for the wage *992 earning capacity he has lost as a result of his accident." Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52, 55 (La.1993). In making these determinations, courts are required to be "mindful of the jurisprudential tenet that worker's compensation law is to be liberally construed in favor of coverage." Smith v. Louisiana Department of Corrections, 93-1305 (La. 2/28/94), 633 So.2d 129, 132; Reed v. Direct Installers, 95-CA-1684 (La.App. 4th Cir. 1/31/96), slip op. at p. 6, 669 So.2d 529, 533-34; Garner v. Sheats & Frazier, 95-39 (La.App. 3d Cir. 7/5/95), 663 So.2d 57, 61.
Generally, a claimant, such as Fortune in the instant case, has the initial burden of showing that he is entitled to SEB benefits because he is unable to earn 90 percent of his pre-injury wages. However, Charbonnet does not dispute that Fortune is entitled to SEB. Once the claimant's prima facie case has been proved, the burden shifts to the employer to prove that "the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region." LSA-R.S. 23:1221(3)(c)(i); Smith, 633 So.2d at 133; Reed at p. 6, 669 So.2d at 533-34; Garner, 663 So.2d at 61. If the employer carries this burden, the amount of SEB payments is then based on the difference between the average monthly wage and the plaintiff's earning capacity after the injury. LSA-R.S. 23:1221(3)(a); Freeman v. Poulan/Weed Eater, 93-1530 (La. 1/14/94), 630 So.2d 733, 739; Reed at p. 6, 669 So.2d at 533-34; Garner, 663 So.2d at 61.
Charbonnet claims that it met this burden in the instant case, based on Jarman's testimony. Jarman testified that she found the following jobs that Fortune could handle, all of which paid $4.25 per hour: sewing machine operator, elevator operator, elevator attendant, ticket taker, gate tender/security, mop head sewer, and assembler. Once these jobs were located by jarman in March of 1993, a list of the jobs was sent to Fortune's physician, to Fortune, and to Fortune's attorney. Only after the physician approved the jobs[2] did Charbonnet reduce Fortune's benefits on April 23, 1993. Charbonnet claims that it therefore fulfilled its obligations under the statutes to show the availability of work, based on the list of jobs identified by Jarman.
In order for an employer to properly reduce SEB payments, it must show that the employee is earning less than he is able to earn. Reed at p. 7, 669 So.2d at 534; Smith, 633 So.2d at 133. In order to do that, the employer must prove that the employee was physically able to perform a particular job and either that the job was offered to the employee or that the job was available to the employee in his community or reasonable geographic region. Reed at p. 7, 669 So.2d at 534; Garner, 663 So.2d at 61. Generally, an employer can meet that burden by "showing that jobs are generally available within the range of the employee's capacity." Reed at p. 7, 669 So.2d at 534; Ambrose v. Fluor Constructors, Inc., 537 So.2d 1176, 1181 (La.App. 4th Cir.1988). However, as in other circuits, "the jobs proven to be available to an employee under R.S. 23:1221(3)(c)(1) must be realistically obtainable by the employee and must offer earnings which are more than mere speculation." Reed at p. 7, 669 So.2d at 534; Culotta v. Great Atlantic & Pacific Tea Co., 524 So.2d 259 (La.App. 5th Cir.), writ denied, 530 So.2d 88 (La.1988).
The defendant in the instant case relies on Jarman's testimony that the jobs she included on the list were suitable for Fortune, given his limitations caused by the accident. Our review of the record indicates that the employer did in fact meet its burden of proof on this issue.
*993 However, the fact that the defendant met its burden of proof does not end the inquiry. Under the applicable jurisprudence, once the defendant employer meets his burden under the statute, the burden shifts back to the employee to show "by clear and convincing evidence, unaided by any presumption of disability, that he is unable to perform employment offered or available solely as a consequence of substantial pain." LSA-R.S. 23:1221(3)(c)(ii); Reed at p. 7-8, 669 So.2d at 534-35; Garner, 663 So.2d at 61; Brown v. Blue Grass Liquor Co., 25552-CA (La.App. 2d Cir. 2/23/94), 632 So.2d 904, 910.
The record in the instant case shows that Fortune met his burden of showing that he was unable to perform any of the jobs identified by Jarman through the testimony of vocational expert Bob Roberts. Roberts testified that he performed a vocational evaluation on Fortune at the request of Fortune's attorney. The results of that evaluation state the specific limitations of Fortune's ability to perform specific job tasks in great detail. After performing the vocational evaluation, Roberts testified to his opinion that Fortune could not do sedentary to light jobs in any kind of competitive market. Thus, Roberts said, Fortune's prognosis for returning to work was not good. Moreover, Roberts testified that he contacted each of the employer's listed on Jarman's initial labor market survey and discovered that none of them had a job available that Fortune could actually perform.
The hearing officer's reasons for judgment specifically found Roberts' testimony more credible than Jarman's because it was "based on a more thorough, personal review of claimant's abilities." The hearing officer found the following differences in the two experts:
(1) Unlike Jarman, Roberts contacted the employers on the March, 1993, job survey and essentially found that either the jobs were blatantly beyond claimant's physical capabilities or were not available; and (2) unlike Jarman, Roberts tested claimant in situations wherein jobs were simulated and concluded that claimant was not capable of securing or later maintaining sedentary to light job duties at or near a competitive level.
Further, Fortune's treating physician testified that his approval of the jobs was based purely on Jarman's descriptions of the job requirements. A claimant may rebut an employer's proof of the availability of jobs by showing that "`economic and other conditions' belie such availability." Reed at p. 8, 669 So.2d at 534-35; Romero v. Grey Wolf Drilling Co., 594 So.2d 1008 (La.App. 3d Cir.1992). The record indicates that the hearing officer was not manifestly erroneous in finding that no jobs were available between April 23, 1993 and July 1, 1993 which Fortune was physically capable of performing.
Charbonnet claims that the hearing officer improperly credited Roberts' testimony over Jarman's testimony. However, our review of the record supports the hearing officer's conclusions on this issue. During her testimony, Jarman admitted that she had not talked to any of the prospective employers reportedly having jobs available at the time the initial labor market survey was performed. She admitted that the list was compiled from job exploration surveys conducted by other personnel in her office. Moreover, our review of Jarman's description of the jobs revealed that qualifications for applicants were not included in the information forwarded to Dr. Butler, only reported job duties. The fact that Fortune is a 60-year-old black male who is virtually illiterate was not communicated to any employer. In the face of Fortune's evidence that the labor market survey was not valid, it becomes obvious that Charbonnet's reduction of Fortune's benefits was improper.
However, Charbonnet claims that the fact that Fortune was later able to earn some money "working" at his stepmother's laundromat belies this conclusion. However, Fortune presented evidence that his employment was a kind of "sheltered employment," created for Fortune by his stepmother in order to help him out after Charbonnet reduced his benefits and he was unable to pay his bills and meet his other financial obligations. The evidence indicates that Fortune would be unable to find a comparable *994 job paying minimum wage which he could perform for 40 hours a week on the open market, given Fortune's physical and mental limitations. The trial court's conclusion that the job Fortune performs for his stepmother is the only job he would be able to secure is amply supported by the record evidence.[3]
Thus, we affirm the hearing officer's award of TTD benefits to Fortune from April 23, 1993 to July 1, 1993, as well as his award of SEB benefits based on $45 per week from July 1, 1993.
Medical benefits
Charbonnet's arguments regarding the $2,069.56 awarded by the hearing officer to Tulane Medical Center Clinic for unpaid medical expenses is confusing. Charbonnet claims that the amounts it has previously paid are sufficient for the services rendered to Fortune under the provisions of LSA-R.S. 23:1034.2. However, Charbonnet's arguments are not supported by the record. Keith Brown, a collector for Tulane Medical Center Clinic, stated unequivocally at trial twice that the outstanding balance on Fortune's account was owed even after Tulane had taken the appropriate workers' compensation discounts. At one point during cross-Brown's testimony seems to contradict this statement, but a clear reading of the transcript reveals that Brown was confused by the question at that point. Moreover, there is nothing in the record to indicate that the balance due to Tulane Medical Center Clinic is not owed. We find no merit in Charbonnet's arguments on this issue.

Penalties and attorney fees
Finally, Charbonnet claims the hearing officer improperly awarded penalties and attorney fees for its arbitrary and capricious reduction of Fortune's benefits. The standard for determining whether penalties and attorney fees should be assessed for an employer's arbitrary and capricious refusal to pay or reduction of workers' compensation benefits is whether "the employee's rights to benefits are reasonably controverted." Reed at p. 9, 669 So.2d at 535; Schmitt v. City of New Orleans, 632 So.2d 367, 374 (La.App. 4th Cir.1993). The employee's right is "deemed reasonably controverted if the employer or insurer had a reasonable basis for believing that compensation and medical expenses were not due." Reed at p. 9, 669 So.2d at 535; Schmitt, 632 So.2d at 374.
The record in the instant case indicates that Charbonnet did not have a reasonable basis for believing that it could properly reduce Fortune's benefits. Charbonnet simply identified some employers who possibly had job openings which Fortune would be qualified to fill. The record indicates that Charbonnet failed to follow up on the job leads, and in fact failed to adequately determine whether the jobs identified were appropriate for Fortune given his many limitations. As the hearing officer noted, considering the "totality of the circumstances *995 Fortune's "ability to obtain employment other than at his [stepmother's] laundromat is very slight." If Charbonnet's investigation of the availability of jobs had been reasonable, it would have reached the same conclusion. Under the circumstances, we find no manifest error in the trial court's award of penalties and attorney fees.
Further, Fortune answered Charbonnet's appeal seeking additional attorney fees for work done on appeal. We award $1,500 attorney fees for the additional work performed by Fortune's attorney on appeal.

Conclusion
Accordingly, the trial court judgment is affirmed. Fortune is awarded an additional $1,500 in attorney fees for work done on appeal.
AFFIRMED.
NOTES
[1] In brief, both Fortune and Charbonnet indicate that the hearing officer awarded Fortune TTD for the period between the date Fortune's benefits were reduced on April 23, 1993 until Fortune went to work for his stepmother on July 1, 1993. However, the judgment of the hearing officer specifically states that Fortune is entitled only to SEB, not TTD. In reality the difference is only semantic because SEB benefits which are not reduced because the claimant is actually earning money or because he is capable of earning money are the same as TTD benefits.
[2] The fact that Dr. Butler approved all nine of the jobs listed on Jarman's initial labor market survey is unclear from the record. However, Fortune does not contest Charbonnet's assertion that they were. We would note that Dr. Butler testified at the hearing that his approval of the jobs was based on the description of the job duties supplied by Jarman. Moreover, Dr. Butler stated at trial that he would defer to the vocational evaluation experts concerning Fortune's actual ability to perform any given job.
[3] Charbonnet also points to a videotape of Fortune "working" at his stepmother's laundromat contained in the record as evidence that Fortune is more physically able to work than he admits. However, the trial court did not give much credence to the videotape, and neither do we. The activities performed by Fortune on the videotape would not seem to belie any of Roberts' conclusions concerning Fortune's physical limitations. Moreover, Fortune's actions in the videotape do not indicate that he has physical skills which would be transferable to a competitive job market. The fact that Dr. Butler opined that he would expect that Fortune could do the kinds of activities performed on the videotape does not change this conclusion. The record evidence taken as a whole is insufficient to prove that a job is reasonably available to Fortune under all the circumstances surrounding this case. In the absence of such proof, Charbonnet's reduction of Fortune's benefits was improper.

Charbonnet would also have this court find, contrary to the findings of the hearing officer, that Fortune had been working in his mother's laundromat even while receiving TTD benefits. There is simply no evidence to support this assertion.
Finally, Charbonnet claims that Fortune's own testimony on the videotape indicates that he had been working some 50 hours per week. It is true that Fortune indicates in a conversation with the private investigator who took the videotape that he worked extensive hours and that his involvement was crucial to the success of the business. However, Fortune also told the private investigator that he owned the laundromat, and Charbonnet does not even represent that that statement should be accepted as true. Fortune admitted in his testimony at trial that he brags a lot, saying that he can do things that he can't because he is embarrassed by his condition.